## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

THE HUNTINGTON NATIONAL BANK  :
41 South High Street  :
Columbus, Ohio 43215  :
   : Case No. 2:13-cv-1087
   :
THE HUNTINGTON COMMUNITY  :
DEVELOPMENT CORPORATION  : Judge
7575 Huntington Park Dr.  :
Columbus, OH 43235  : Magistrate Judge
   :
      Plaintiffs,  :
   :
v.  :
   :
JOSEPH P. MOLNAR  :
261 Indian Springs Lane,  :
Chillicothe, OH 45601  : **COMPLAINT FOR**
   : **DAMAGES AND INJUNCTIVE**
J. PROPERTY MANAGEMENT, LLC  : **RELIEF**
c/o Joseph P. Molnar, Statutory Agent  :
261 Indian Springs Lane  :
Chillicothe, OH 45601,  :
   : **JURY DEMAND ENDORSED HEREIN**
And  :
   :
JOHN DOES 1-10,  :
[Address Unknown]  :
   :
      Defendants.  :

## PRELIMINARY STATEMENT

1.      This case involves a scheme to systematically divert at least $2.716 million from

Plaintiffs The Huntington National Bank ("Huntington" or the "Bank") and The Huntington

Community Development Corporation ("Huntington CDC" or the "CDC") to a bank account

owned and controlled by Defendants Joseph P. Molnar and J. Property Management, LLC.

2.      Huntington CDC is a subsidiary of the Bank. Huntington provides funds to the

CDC, which, in turn, invests in low income housing tax credit development projects, or other

4471048v9

qualified real estate development ("Tax Credit projects").  As a result of the CDC's investment in these Tax Credit projects, Plaintiffs receive federal tax credits or benefits that exceed the amount of the funds invested by the Bank.

3.      Molnar is a former employee of the Bank who helped manage the CDC.  Upon information and belief, Molnar had significant responsibility for managing Huntington CDC's Tax Credit investment portfolio.

4.      At least since 2008, Plaintiffs included a "development advisory fee" in many of its Tax Credit investments.  This development advisory fee was intended to compensate Plaintiffs for the cost of managing the Tax Credit investment portfolio.  Typically, this fee was paid by the developer by refunding a percentage (usually 1%) of the net equity invested by Plaintiffs into the Tax Credit project.

5.      Though these development advisory fees were owed to Plaintiffs under the Tax Credit investment agreements, Molnar diverted these fees to an account owned by Defendant J. Property Management, LLC at the Vinton County National Bank ("VCNB").  This account for J. Property Management was controlled by Molnar, among others.

6.      The Defendants concealed this systematic and ongoing scheme.  Defendant Joseph Molnar used his position of employment with Huntington CDC to actively conceal and not disclose to Plaintiffs that the Defendants were diverting funds from the Plaintiffs to Defendant J. Property Management.

7.      Plaintiffs recently discovered this fraud, which had been concealed by Defendants, by reviewing documents relating to a Tax Credit project that did not provide for the payment of a development advisory fee.

2

8.      In September 2013, the Plaintiffs were preparing for the closing of a Tax Credit project known as "Broderick Tower."  Plaintiffs invested $5.2 million in the project.  Per the Broderick Tower operating agreement, the Plaintiffs' equity investment was to be made in two payments.  A small, initial installment was paid on or around June 2011.  The vast majority of the investment was to be made in a second installment paid in October 2013.

9.      In preparation for this second installment, Plaintiffs discovered that a development fee of approximately $128,000 was made in June 2011 from Huntington CDC to J. Property Management as part of the Plaintiffs' first installment, even though the fee was not specified in the Broderick Towers Tax Credit investment agreement.

10.     Plaintiffs then determined that this fee was deposited into the account for J. Property Management at the VCNB.

11.     Defendants perpetrated this scheme from at least 2008 to 2012.  As a result of this scheme, Defendants committed at least 38 separate incidents of taking funds to the Plaintiffs, totaling over $2.716 million.

12.     Joseph Molnar subsequently acknowledged to Huntington personnel that he caused funds owed to Plaintiffs to be diverted J. Property Management without authorization.

13.     Plaintiffs request this Court to issue temporary, preliminary, and permanent injunctive relief to prevent the transfer or dissipation of any funds or property derived from this fraud.  Plaintiffs further request this Court to require Defendants to deposit funds derived from the fraud with the Clerk of Courts.

## THE PARTIES

14.     Plaintiff The Huntington National Bank is a national banking association with its main office in Columbus, Ohio.

3

15.     Plaintiff The Huntington Community Development Corporation is an Ohio corporation with its principal place of business in Columbus, Ohio.  Huntington CDC is a wholly owned subsidiary of The Huntington National Bank.

16.     Defendant J. Property Management, LLC is an Ohio limited liability company established by Joseph P. Molnar with its principal place of business in Chillicothe, Ohio.  J. Property Management received funds misappropriated from the Plaintiffs that are the subject of this action.

17.     Defendant Joseph P. Molnar is a former employee of Huntington who helped manage Huntington CDC.   Molnar is the leader of the conspiracy to divert development advisory fees from Plaintiffs.

18.     Defendants John Does 1-10 are unknown co-conspirators who have been actively involved in the scheme, by diverting Huntington's development advisory fees and/or funds, and/or receiving funds from the J. Property Management Account, and concealing Defendants' scheme.  Their names and/or contact information could not be identified at the time of filing this action.

## JURISDICTION & VENUE

19.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs asserts a claim arising under the laws of the United States. Specifically, Plaintiffs allege a civil RICO claim under 18 U.S.C. §§ 1962 & 1964.

20.     This Court has supplemental jurisdiction over the common law and Ohio statutory claims pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over the Defendants because they are Ohio residents; they have committed tortious acts in Ohio; or are otherwise subject to personal jurisdiction in Ohio.  The Defendants perpetrated this fraud in Ohio by diverting development

4

advisory fees and other funds from an Ohio bank and depositing the fees in a different Ohio bank.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because, among other things, a substantial part of the events giving rise to the claims occurred, and a substantial part of property that is the subject of the action is situated within this judicial district.

## PLAINTIFFS INVEST IN TAX CREDIT PROJECTS THROUGH THE HUNTINGTON CDC

23. Federal tax law encourages the investment in the development of low-income housing through the Tax Credit program. Under the program, federal tax credits are awarded to developers of qualified real estate projects. Developers then sell these tax credits to investors to raise capital to fund the projects. After several years, the investor receives tax credits and benefits that exceed the amount of the principal investment.

24. To invest in Tax Credit projects, Huntington created a wholly owned subsidiary, Huntington CDC. The Bank provides capital to CDC to invest in Tax Credit projects.

25. From at least 2008 to 2012, Molnar helped manage Huntington CDC investments. Molnar was the signatory for Huntington CDC on many agreements memorializing Huntington CDC's investment into Tax Credit projects.

26. As part of its Tax Credit investment, Huntington CDC would enter into one of two types of agreements. Huntington CDC would enter into a limited partnership directly with a Tax Credit developer, with the developer as the general partner and Huntington CDC as the limited partner.

27. Alternatively, Huntington CDC would enter a Tax Credit deal through a "syndicator," which functioned as a broker for such projects. The syndicator would create a limited liability company to which investors would make their capital contributions. Under this

5

arrangement, Huntington CDC would be an "investment member" of such limited liability companies.

28.     By 2008, nearly all of Huntington's CDC Tax Credit agreements provided for a "development advisory fee" to Huntington CDC.  Huntington CDC's investment would include its capital contribution plus the amount of the development advisory fee.  The general partner or managing member would then refund the development advisory fee to Huntington CDC.

29.     For instance, on January 1, 2009, Huntington CDC entered a partnership agreement titled "Unity Housing Apartments, LP."  Huntington CDC was a limited partner in the partnership, while the developer Gihon Unity Apartments, Inc. was the general partner.  A true and accurate copy of the partnership agreement is attached as **Exhibit A**.

     a.     Pursuant to the Agreement, Huntington CDC agreed to make a capital contribution for $10,743,181.  *Id.* at § 2.2(a).

     b.     Section 5.5(d) provided for the payment of a "Development Advisory Fee" to the Limited Partner (Huntington CDC) in connection with the development and rehabilitation of the Property.

     c.     Appendix I defined the "Development Advisory Fee" as an amount totaling $211,040.

     d.     The First Amendment to the Unity Housing Apartments Partnership Agreement amended the Agreement to provide for a capital contribution of $11,172,918 and a "Development Advisory Fee" in the amount of $640,767. Huntington CDC's capital contribution was increased by the amount of the development advisory fee.  The developer would then refund to Plaintiffs the amount of the development advisory fee.

6

30.     On September 17, 2010, Huntington CDC became the Investor Member in the CITY Huntington Tax Credit Fund III, LLC.   A true and accurate copy of the Operating Agreement and its Amendments are attached hereto as **Exhibit B** and expressly incorporated herein.

a.     Section 5.6.2 of the Agreement authorized the managing member to pay one percent (1%) of the capital contribution for each local partnership to the investor member (Huntington CDC) for certain advisory services, titled the "Development Advisory Fee."

b.     Section 1.1 defined the "Development Advisory Fee" as the "fee payable to the Investor Member for investment oversight and asset management performed by the Investor Member."

c.     A true and accurate table of the Development Advisory Fees for the CITY Huntington Tax Credit Fund, III, LLC is attached hereto as **Exhibit C** and expressly incorporated herein.

31.     From time to time, Tax Credit agreements were amended to include a development advisory fee, even where such fee was not part of the original agreement.

a.     For example, on May 5, 2010, Huntington entered the "Huntington Ohio ARRA Fund LLC" as the "Investor Member."  This operating agreement did not provide for a development advisory fee.  A true and correct copy of the Operating Agreement and its Amendments are attached hereto as **Exhibit D** and expressly incorporated herein.

b.  The Third Amendment to the Operating Agreement, however, called for Huntington CDC to receive an "Advisory Fee" in the amount of $48,617, or one percent (1%) of the net equity investment.

c.  Molnar was the signatory to this Amendment.  A true and accurate table of the Development Advisory Fees Agreements for the Huntington Ohio ARRA Fund LLC are attached hereto as **Exhibit C** and expressly incorporated herein.

<u>**THE DEFENDANTS COMMITTED ONGOING FRAUD**</u>

32.     From at least December 1, 2008 to July 31, 2012, Defendants engaged in an ongoing fraudulent scheme to divert the development advisory fees that Plaintiffs were supposed to receive under the terms of the Tax Credit investment agreements, or other funds owned or controlled by Plaintiffs.  The Defendants committed at least 38 separate incidents of diverting funds from the Plaintiffs to the J. Property Management account, totaling at least $2.716 million.

33.      Molnar executed this fraud by causing the Plaintiffs to fund cashier's checks or other withdrawals in the amount of the development advisory fees that Plaintiffs were receiving from developers.  These checks and withdrawals were then issued to J. Property Management, which would deposit these checks in its account at VCNB.  Molnar, among others, controlled this account at VCNB.

34.     Molnar caused the payment of Plaintiffs' funds to J. Property Management on at least 38 separate occasions over five years.

35.     At least 29 of the 38 diverted development advisory fees were paid by issuing cashier checks debited from the Huntington CDC.

36.     At other times, Molnar requested the developer to make a direct payment from its account to J. Property Management's bank account at VCNB.

8

4471048v9

37.     At least four withdrawals originated from Huntington customer accounts.  These customers owed Plaintiffs the advisory fees pursuant to the Tax Credit investment agreement. Rather than being paid to Huntington, however, Molnar caused the fees to be paid directly to J. Property Management's Account at VCNB.

38.     A complete listing of the 38 debits or cashier's checks, the date of transfer, amount of debit or check, the payee, CC Memo and/or check memo, and the source is attached hereto as **Exhibit E.**  This information is expressly incorporated into the Complaint as if fully rewritten herein.

39.     For instance, on January 21, 2009, the Huntington CDC received $211,040 as the development advisory fee for the Unity Housing Project.

    a.     On January 30, 2009, Molnar caused J. Property Management to be issued a cashier's check from Huntington CDC for that same amount.  A true and accurate copy of the cashier's check is attached hereto as **Exhibit F** and expressly incorporated herein.

    b.     On February 12, 2009, Huntington CDC received $429,727 as the development advisory fee pursuant to the amendment to the Unity Housing Project. That same day, Joe Molnar caused Huntington CDC to issue J. Property Management a cashier's check for $429,727.00.  A true and accurate copy of the Cashier's check is attached hereto as **Exhibit G** and expressly incorporated herein.

    c.     The two transfers equaled $640,767, the total amount Huntington CDC was owed in development advisory fees.

40.     Similarly, on August 30, 2011, Huntington CDC entered the Eleventh Amendment to the Huntington Ohio ARRA Fund LLC.

9

       a.      The Eleventh Amendment provided for Huntington CDC to receive a development advisory fee of $38,809.  *See* **Exhibit H**.

       b.      On September 7, 2011, Huntington CDC received the $38,809 fee.

       c.      On September 29, 2011, Joseph Molnar caused Huntington CDC to issue a cashier's check for $38,809 to J. Property Management at VCNB.  A true and accurate copy of the cashier's check is attached hereto as **Exhibit I**.

41.      On April 2, 2012, the CITY Huntington Tax Credit Fund III, LLC was amended with the Sixth Amendment for the "Willow Tree II" project.

       a.      Huntington CDC invested $4,836,946.00 into the Willow Tree II project as an aggregate contribution, with $ 4,279,314 as the investment in the project.

       b.      Pursuant to Section 5.6.2 of the Operating Agreement, Huntington CDC was entitled to a one percent (1%) developmental advisory fee.

       c.      On April 3, 2012, Huntington CDC received $42,793 for its development advisory fee.

       d.      That same day, Joseph Molnar caused a cashier's check for $42,793 to be issued from Huntington to J. Property Management.  A true and accurate copy of the cashier's check is attached hereto as **Exhibit J**.

**THE DEFENDANTS CONCEALED THE ONGOING FRAUD FROM PLAINTIFFS**

42.      The Defendants actively misrepresented and concealed their activities from the Plaintiffs throughout the Defendants' ongoing scheme.

43.      Joseph Molnar used his position of employment to control the receipt of development advisory fees.

44.     Molnar misrepresented to the Plaintiffs that he was properly providing the development advisory fees to the Plaintiffs, while simultaneously misleading Plaintiffs' employees to issue cashier checks to J. Property Management for the development advisory fees.

45.     Alternatively, upon information and belief, Molnar misrepresented to Plaintiffs' customers who owed Huntington CDC development advisory fees that these fees would be paid to Plaintiffs.  In fact, such payments were made to J. Property Management.

46.     Throughout the ongoing scheme, Defendants actively concealed and did not disclose their misconduct in diverting over $2.716 million in advisory fees from the Plaintiffs to the J. Property Management Account.

47.     Plaintiffs reasonably relied upon their employee Molnar's representations that he was properly managing any development advisory fees and not diverting those funds for his benefit.

## DISCOVERY BY PLAINTIFFS OF THE DEFENDANTS' CONSPIRACY

48.     On or around June 2011, Huntington CDC made an investment of approximately $5.2 million into a Tax Credit project titled the "Broderick Tower."

49.     Unlike many of the other Tax Credit projects, the Broderick Tower project did not provide for a development advisory fee for Huntington CDC.

50.     Under the Broderick Tower operating agreement, the Plaintiffs' investment was to be made in two payments.  Plaintiffs paid a small, initial installment on or around June 2011. The vast majority of the investment was to be paid in September 2013.

51.     In September of 2013, in preparation for the second investment relating to the Broderick Tower development, the Plaintiffs reviewed the closing documents and investment materials.

11

52.    At that time, Plaintiffs discovered a "development agent fee" of approximately $128,000 paid by Huntington CDC relating to the Broderick Tower deal, even though no such payment was called for by the agreement.

53.    Plaintiffs determined that the cashier's check used to pay the development agent fee was made out to J. Property Management and deposited in an account at the VCNB.

54.    After contacting the VCNB, Plaintiffs discovered that Joseph Molnar was the person who controlled the account.

55.    In the process of investigating the placement agent fee, Plaintiffs contacted Joseph Molnar to determine why such a payment was made.  Molnar falsely claimed that the payment was perhaps a brokerage fee.  Molnar did not disclose that he diverted the fee to J. Property Management.

56.    The Plaintiffs only began to discover the Defendants' ongoing fraudulent scheme when the Plaintiffs uncovered the payment of the Broderick Towers' fee to J. Property Management in September 2013.

57.    After additional review, Plaintiffs determined that J. Property Management received 38 debits or cashier's checks since 2008 totaling $2.716 million that was linked to fees Plaintiffs should have received from Tax Credit projects.  *See* **Exhibit E**.

## MOLNAR ACKNOLWEDGES HIS WRONGDOING

58.    On October 31, 2013, Huntington personnel contacted Joseph Molnar by telephone.  The Huntington employees asked Molnar to explain why J. Property Management received payments from development advisory fees owed to Plaintiffs.

59.    Molnar eventually acknowledged the he made payments to J. Property Management from funds owed to the Plaintiffs.

12

60.     Molnar admitted that he had no authorization to make these payments.

61.     Molnar further acknowledged that J. Property Management was not entitled to the development advisory fees and that the funds belonged to the Plaintiffs.

62.     Molnar recognized an obligation to repay Plaintiffs all of the funds taken by the Defendants.

## PLAINTIFFS' DAMAGES

63.     Defendants have admitted they have perpetrated an ongoing fraudulent scheme to systematically divert funds from the Bank and the CDC to Defendants.

64.     Huntington has suffered at least $2.716 million in damages, the currently known amount of funds converted by the Defendants.

## FIRST CAUSE OF ACTION:
## FRAUD (ALL DEFENDANTS)

65.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully rewritten herein.

66.     Defendants made repeated false representations and/or concealments of fact, by diverting development advisory fees or other funds from Plaintiffs.  In particular, Defendants made false representations and concealments of fact by, in at least 38 separate instances, diverting funds owed to Plaintiffs to J. Property Management.

67.     Defendants conspired and joined in the fraud, by diverting development advisory fees and other funds from Plaintiffs.  Defendants concealed these activities from Plaintiffs, and failed to disclose that they were diverting funds from the CDC.

68.     Such misrepresentations or concealments of fact were material.  Without such misrepresentation or concealment, Plaintiffs would not have allowed Defendants to divert funds from the CDC.

13

69.     Defendants knowingly made these false representations and concealments of fact. Defendants further intended Plaintiffs to rely upon these false representations and concealments of fact.

70.     Plaintiffs justifiably relied upon these false representations and/or concealment of facts by permitting the 38 payments to be made from Plaintiffs.

71.     Defendants converted the funds.  A complete listing of the 38 payments of Plaintiffs' funds to J. Property Management is attached hereto as **Exhibit E**.

72.     Plaintiffs have been, and will be injured thereby, because Plaintiffs were defrauded of at least $2.716 million.  Plaintiffs have also suffered additional damages, such as the costs of investigation and recovery.

<u>**SECOND CAUSE OF ACTION:**</u>
<u>**CONVERSION (ALL DEFENDANTS)**</u>

73.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully rewritten herein.

74.     Pursuant to the applicable Tax Credit agreements, Plaintiffs had the clear legal right to advisory fees paid under the Operating Agreements.  Exemplars of Operating Agreements are attached hereto and are expressly incorporated herein.

75.     Defendants wrongfully interfered with Plaintiffs' possession and ownership of these development advisory fees and other funds.  Specifically, Molnar used his position as a manager of the Huntington CDC to divert advisory fees to J. Property Management.  A complete listing of the 38 debits or cashier's checks is attached hereto as **Exhibit E**.

76.     Plaintiffs have been, and will be injured thereby, because Defendants converted $2.716 million in fees or other funds owed to Plaintiffs.  Plaintiffs have also suffered additional damages, such as the costs of investigation and recovery.

14

4471048v9

### THIRD CAUSE OF ACTION:
### CIVIL CONSPIRACY (ALL DEFENDANTS)

77.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully rewritten herein.

78.     Defendants engaged in a malicious combination to defraud Plaintiffs from development advisory fees and other funds.

79.     Huntington has been, and will be injured thereby, through the Defendants' diversion of $2.716 million in advisory fees and other funds.  Plaintiffs have also suffered additional damages, such as the costs of investigation and recovery.

### FOURTH CAUSE OF ACTION:
### CIVIL RICO, 18 U.S.C. § 1962 AND § 1964 (ALL DEFENDANTS)

80.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully rewritten herein.

81.     Defendants engaged in a RICO conspiracy under 18 U.S.C. § 1962 by diverting development advisory fees and other funds from Plaintiffs to Defendants.

82.     Defendants conducted, controlled, operated and managed a RICO enterprise that was engaged in fraudulent scheme to divert funds from Plaintiffs to Defendants.

83.     Defendants comprise a RICO enterprise (the "Molnar Enterprise") pursuant to 18 U.S.C. § 1961(4).  Defendant J. Property Management, LLC is a limited liability company that is engaged in the illegal business of receiving funds diverted from Plaintiffs.

84.     Joseph Molnar has duties relating to the ongoing Molnar Enterprise by, among other things: previously using his position as manager at the Huntington CDC to divert development advisory fees and other funds from Huntington to J. Property Management; causing Plaintiffs to issue funds in favor of J. Property Management; depositing these stolen funds in J. Property Management's bank account at VCNB; and concealing such activities from Plaintiffs.

15

85.     Defendants have engaged in a pattern of racketeering activity, with multiple predicate acts.  These include:

(a)  Multiple acts of bank fraud, 18 U.S.C. § 1344, by perpetrating a scheme to defraud and divert fees, funds, or moneys owed to Plaintiffs, or fraudulently obtaining moneys, funds, credits, assets or other property owned by, or under the custody or control of the Plaintiffs;

(b)  Multiple acts of wire fraud, 18 U.S.C. § 1343, by using the wires and/or methods of electronic communication in interstate commerce to perpetrate a scheme to defraud and divert fees, funds or moneys owed to Plaintiffs., including instructing Huntington account customers that owed Plaintiffs development advisory funds to wire those funds to J. Property Management's account.

86.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek recovery and treble damages from Defendants for the injuries caused by the RICO conspiracy.  Plaintiffs have been, and will be injured by Defendants' conversion of advisory fees and other funds.

<u>**FIFTH CAUSE OF ACTION:**</u>
<u>**INJUNCTIVE RELIEF (ALL DEFENDANTS)**</u>

87.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully rewritten herein.

88.     Plaintiffs have demonstrated a likelihood of success on the merits for the causes of action outlined above.

89.     Absent injunctive relief, Huntington will be irreparably harmed because, among other things, Defendants will likely hide or spend the remaining funds derived from the fraud.

4471048v9

90.     Furthermore, upon information and belief, Defendants have transferred or hidden the funds from this fraud.  Absent injunctive relief, Huntington will be irreparably harmed because it will be unable to recover funds to cover its loss.

91.     The granting of injunctive relief will not cause substantial harm to others, as the Plaintiffs are entitled to a return of funds stolen from Huntington accounts.

92.     Preventing Defendants from hiding or spending the stolen assets will serve the public interest.

93.     Huntington requests injunctive relief as follows:

(a)     Enjoining Defendants from spending, using, dissipating, or otherwise transferring funds from the J. Property Management account at VCNB;

(b)     Ordering the Defendants to immediately deposit with the Clerk of Court the withdrawals made from the J. Property Management Account, until resolution of this action;

(c)     Prohibiting Defendants from transferring, dissipating, or encumbering property that was purchased with the funds derived from this fraudulent scheme;

(d)     Ordering the Defendants to permanently refund to Plaintiffs misappropriated funds;

(e)     Such other relief as may be appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests the following relief:

(A)     Injunctive relief as set forth above;

(B)     Damages in an amount in excess of $75,000, to be determined at trial;

(C)     Treble damages pursuant to 18 U.S.C. § 1964(c);

(D)     Pre-judgment and post-judgment interest;

(E)     Attorneys' fees and costs in prosecuting this action; and

4471048v9

(F)     Any other relief this Court deems just and proper.

Respectfully submitted,

/s/ John P. Gilligan
John P. Gilligan, Trial Attorney (0024542)
ICE MILLER, LLP
250 West Street
Columbus, Ohio 43215
Tel:     (614) 462-2221
Fax:     (614) 222-3438
Email: john.gilligan@icemiller.com

*Counsel for Plaintiffs The Huntington National Bank and The Huntington Community Development Corporation*

OF COUNSEL:

Albert G. Lin   (0076888)
Ross R. Fulton (0082852)
ICE MILLER, LLP
250 West Street
Columbus, Ohio 43215
Tel:     (614) 462-2700
Fax:     (614) 222-3438
Email: albert.lin@icemiller.com
          ross.fulton@icemiller.com

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

/s/ John P. Gilligan

4471048v9